**U S WEST COMMUNICATIONS, INC., Plaintiff,**

v.

**TCG OREGON, a limited Partnership; Roger Hamilton, Ron Eachus, Commissioner, and Joan H. Smith, Commissioner, in their official capacities as Commissioners of the Oregon Public Utility Commission; and Oregon Public Utility Commission, Defendants.**

Civil No. 97–858–JE.

United States District Court,
D. Oregon.

Dec. 10, 1998.

830

Lawrence H. Reichman, Chin See Ming, Perkins Coie, Portland, OR, Sherilyn C. Peterson, Kirstin S. Dodge, Perkins Coie, Bellevue, WA, Norton Cutler, U.S. West Communications, Inc., Denver, CO, for plaintiff U.S. West Communications.

Keith L. Kutler, Davis Wright Tremaine, Portland, OR, Paul M. Gordon, Wendell H. Goddard, Gordon & Goddard, Oakland, CA, for defendant TCG Oregon.

Michael T. Weirich, W. Benny Won, Assistant Attorneys General, Department of Justice, Salem, OR, for defendants Oregon Public Utility Commission and Commissioners Hamilton, Eachus & Smith.

Philip D. Barz, Emily M. Sweeney, Theodore C. Hirt, Leslie V. Batchelor, U.S. Department of Justice, Civil Division, Washington, DC, Herbert C. Sundby, U.S. Attorneys Office, Portland, OR, for amicus curiae Federal Communications Commission.

## OPINION AND ORDER

JELDERKS, United States Magistrate Judge.

Plaintiff U S West Communications, Inc. ("US West") brings this action against defendants TCG Oregon ("TCG"),[1] the Oregon Public Utility Commission ("PUC"), and PUC Commissioners Roger Hamilton, Ron Eachus, and Joan Smith ("the Commissioners"). The Federal Communications Commission ("FCC") has participated in this proceeding as *amicus curiae.*

The dispute concerns an interconnection agreement between U.S. West and TCG ("the Agreement"). The background facts and procedural history are described in the prior opinion dated January 30, 1998, which denied defendants' motions to dismiss. The parties have each moved for summary judgment.

### SCOPE AND STANDARD OF REVIEW

The Telecommunications Act of 1996 ("the Act"), Pub.L. No. 104–104, 110 Stat. 56, 47 U.S.C. § 153 *et seq.,* provides for federal district court review of interconnection agreements concluded pursuant to 47 U.S.C. § 252. "[A]ny party aggrieved" by a decision of a state public utilities commission concerning such an agreement "may bring an action in an appropriate Federal district court to determine whether the Agreement ... meets the requirements of the Act." 47 U.S.C. § 252(e)(6). The Act does not specify either the standard or scope of review.

■ After some initial hesitation, the parties now generally agree that the scope of this court's review is limited to the administrative record. With regard to the standard of review, it is neither desirable nor practical for this court to sit as a surrogate public utilities commission to second-guess the decisions made by the state agency to which Congress has committed primary responsibility for implementing the Act in Oregon. Rather, this court's principal task is to determine whether the PUC properly interpreted and applied the Act, which is a question of federal law that is reviewed *de novo.*

In all other respects, review will be under the arbitrary and capricious standard.

### DISCUSSION

**1.   Count I (pricing)**

**A.   Unbundled Loop Price**

The arbitrator established an interim price of $17.20 for an unbundled loop. After this action was commenced, the PUC established a new price of $16.14 in a proceeding known as UM 844. Although the parties refer to this as the "final" price, it is the court's understanding that the $16.14 price may be subject to revision in the future if conditions warrant. Therefore, the court will use the term "UM 844 price" rather than · "final price" when referring to the $16.14 rate.

**(i)   Challenge to Interim Loop Price**

Adoption of the UM 844 price effectively moots U.S. West's challenge to the interim price. US West does not seek compensation for the services (if any) that were purchased at the interim price, so the sole remaining question is the price for future services. That will be governed by the UM 844 price (or its successors).

■ Even if the issue were not moot, this court would affirm the arbitrator's decision establishing the interim price. The PUC began studying unbundled loop prices several years before the Act was enacted. US West actively participated in those earlier proceedings, known as UM 351. When Congress enacted the Act in 1996, it established very short timelines. The arbitrator understandably chose to rely heavily upon the extensive record and analysis that already existed, instead of beginning the process anew.

Reliance on those earlier proceedings did not deny U.S. West due process of law. Contrary to the suggestion in U.S. West's

---

1.   Defendant TCG was recently acquired by AT & T.

brief, the PUC did not apply principles of collateral estoppel to preclude U.S. West from contesting the loop price issue. Rather, the earlier proceedings were treated as evidence that could be considered in the subsequent proceeding, and which the arbitrator and the PUC ultimately found were the most reliable evidence then available. US West was free to introduce contrary evidence and to urge a different result.

The arbitrator also acted properly in declining to consider the voluminous cost studies submitted by U.S. West just two weeks before the hearing. The arbitrator reasonably concluded that he lacked sufficient time to properly analyze those studies before the applicable deadlines, and also expressed concern about the accuracy of those studies.

### (ii) Challenge to UM 844 Loop Price

The court rejects most of U.S. West's arguments concerning the UM 844 price for unbundled loops. The PUC did not err by relying upon the record established in the UM 351, UM 773, and UM 844 proceedings. Nor does the Act require the PUC to ignore its own extensive expertise and experience in overseeing telephone pricing and service in Oregon, and in particular its knowledge of pricing, costs, and related issues as they concern U.S. West.

The parties also dispute the interpretation and application of a stipulation between U.S. West and the PUC. In ¶ 17 of the stipulation, the PUC and U.S. West agreed that in addition to the methodology prescribed in ¶ 16 of the stipulation U.S. West would also submit a study based on the methodology outlined in ¶ 17. The PUC could then compare the results obtained from these two methodologies and decide whether it wished to use the latter method in the future. However, there was no binding commitment by the PUC to use the ¶ 17 methodology in the current round of loop pricing.

■ A more difficult issue is the number of pairs per drop to be used in calculating loop prices. US West contends that most existing homes employ a two-pair design, though new construction often utilizes a three or even four-pair design. The number of pairs per drop materially impacts the loop

price in two respects. First, the total loop investment (*i.e.*, the dividend of the equation) is higher if the scorched node analysis assumes installation of three pairs per drop instead of two. Second, the divisor in the equation is the number of working loops, which is determined by multiplying the total number of loops times the average fill factor (which measures the percentage of lines or other facilities actually being used, as opposed to the theoretical capacity). US West contends that by assuming three pairs per drop instead of two (*i.e.*, the design that will be used for future construction), but using the existing fill factors which are based on two pairs per drop, the PUC has overstated the number of working loops and thereby understated the total loop investment per working loop. That, in turn, diminishes the price U.S. West receives for the use of its loops.

The PUC insists that U.S. West is bound by the stipulation, and urges this court to resolve the dispute pursuant to Oregon contract law. However, ¶ 16 of the stipulation never mentions the number of pairs per drop, nor is that topic specifically discussed elsewhere in the stipulation. The court also reviewed the relevant portions of the record, but found little evidence that this issue was ever discussed or that any agreement was reached. Rather, the discussions about ¶ 16 focused on whether spare capacity should be treated as a volume-sensitive cost, and whether to use the average or the objective feeder fill factor.

It is possible that the number of pairs per drop was understood by all parties or implied by other paragraphs in the stipulation, but the court has seen no clear evidence of that. Nor is it possible for this court to defer to the PUC's expertise unless the agency actually exercised that expertise. The record demonstrates that with respect to this issue, both in its own proceedings and before this court, the PUC relied almost entirely upon its contention that U.S. West was bound by the stipulation as a matter of contract law. As a result, the agency did not address—at least on the record—seemingly fundamental questions such as whether it is appropriate to apply existing fill factors (which are based on

historic drop designs) to the new three-pair drop design, or whether the resulting loop price provides U.S. West "just and reasonable" compensation for the use of its loops as required by the Act.

Rather than conducting a lengthy trial, at which the parties no doubt would present conflicting testimony regarding the negotiations that led to this stipulation as well as industry conventions, the court will remand this matter to the PUC for reconsideration with instructions to resolve these issues by applying its expertise and the principles delineated in the Act, instead of relying upon the stipulation as a binding contract. As part of that reconsideration process, the PUC may reopen the record to accept additional evidence on this issue.

## B. Collocation Rates

■ The arbitrator concluded that it would be more efficient to establish a flat rate for physical collocation at any given U.S. West facility instead of attempting to fix a unique price for each specific location. While not the only permissible choice, it was a reasoned decision which this court will not disturb. The court also will not disturb the arbitrator's decision to fix the price for collocation infrastructure at $40,000 per facility.

Finally, the arbitrator did not err by considering the prices fixed in other agreements as evidence of what is commercially reasonable. This does not implicate the same concerns as the "most-favored-nation" rule that was invalidated in *Iowa Util. Bd. v. Federal Communications Comm'n*, 120 F.3d 753, 800–01 (8th Cir.1997), *cert. granted,* — U.S. ——, 118 S.Ct. 879, 139 L.Ed.2d 867 (1998).

## C. Resale Discount

■ The arbitrator did not err by using, on an interim basis, the low end (17 percent) of the FCC proxy price for resale discounts. As a result of the decision in *Iowa Utilities*, 120 F.3d at 813, the FCC proxy prices are not binding upon the states. Nevertheless, those prices still retain whatever persuasive

force the individual state public utility commissions ascribe to them. A principal reason for developing those proxy prices in the first place was the recognition that individual state public utility commissions might be unable to develop their own prices in time to meet the statutory deadlines. Incumbent local exchange carriers ("ILECs"), such as U.S. West, knew the FCC might be issuing proxy prices and had an opportunity to participate in that rulemaking process. *See* Notice of Proposed Rulemaking, 61 Fed.Reg. 18311 (April 25, 1996). US West also had an opportunity to persuade the arbitrator and the PUC not to use the proxy prices or to set a different price and, in fact, made just such an argument in its presentations. *See, e.g.,* Direct Testimony of Robert G. Harris (R 15A) at 67. There was no due process violation.

■ US West also argues that the proxy prices are based upon industry averages, without regard to the specific circumstances of U.S. West's operations in Oregon and whether U.S. West will actually avoid those costs. Even if that is true, it does not justify setting the decision aside. The arbitrator emphasized that this was merely an interim rate until more accurate cost savings data becomes available and is analyzed. US West's concerns can be addressed at that time.[2]

■ US West's attempt to draw a distinction between costs that are reasonably avoidable, versus costs that are actually avoided, is unpersuasive. The latter would require the Competitive Local Exchange Carriers ("CLECs") and the PUC to micro-manage U.S. West's operations to ensure that U.S. West actually availed itself of all reasonable opportunities for savings. To the extent U.S. West contends that certain costs are in fact not avoidable, it is merely disputing the PUC's (or the FCC's) determination of what costs are "reasonably avoidable."

■ US West next objects to discounting services that are already subject to volume

---

**2.** US West complains that the PUC has failed to establish a schedule for reviewing the cost data. That dispute is not presently before this court. However, to the extent that this court's ratifica-

tion of the PUC's decision is premised in part upon assurances that the PUC will take certain actions at a future date, the court expects the PUC to honor that commitment.

or term discounts. The Act does not exempt such services, *per se*, from the obligation imposed by 47 U.S.C. § 252(d)(3) to make such services available at a wholesale rate that is based upon the retail price less costs that U.S. West will reasonably avoid. However, the wholesale discount for services that already are subject to volume or term discounts ordinarily will be less than the standard wholesale discount, since in all likelihood the existing volume or term discount already takes into account some of the cost savings that could reasonably be achieved from selling the product at wholesale (*e.g.*, billing, marketing). While there may be room for some additional savings, it is unlikely to be the full wholesale discount rate.

■ In the other four interconnection agreements that this court has reviewed (with WorldCom, AT & T, MCI, and Sprint), the wholesale discount rate for these already discounted services was tentatively set at one-half the usual wholesale discount rate (in addition to the existing volume or term discount). By contrast, the TCG Agreement makes no special provision for services that are already subject to volume or term discounts. The court can find no principled basis for this disparity between the TCG Agreement and all other interconnection agreements involving U.S. West in Oregon.

Accordingly, the PUC shall revise Section X of the TCG Agreement to provide that the wholesale discount for services already subject to volume or term discounts shall be the greater of (1) the wholesale discount rate (which is presently 17 percent), or (2) one-half of the wholesale discount rate plus any existing volume or term discount.

■ Finally, U.S. West protests the PUC's determination that residential services are subject to the wholesale discount. US West contends residential service is already priced below cost. However, the Act does not exempt residential services from the wholesale discount requirement. *See* 47 U.S.C. § 252(d)(3). To the extent a particular service is already priced at or below cost, it is possible that U.S. West will not recoup its entire cost, but that would be true without regard to the wholesale discount. By definition, the wholesale discount is based upon the costs that U.S. West could reasonably avoid by selling the service at wholesale. If no costs can be avoided, then there will be no discount. Consequently, U.S. West's net profit or loss on the service should be the same notwithstanding the wholesale discount. If U.S. West fails to recoup its costs, it is because the discount rate is excessive (which is addressed above) or because the price for the service was set too low in the first place. The latter issue does not directly concern the Act or the interconnection Agreement, but must be separately addressed in an appropriate PUC proceeding. For the same reason, there is no taking, since U.S. West's net profit or loss on the particular service should be the same as before the wholesale discount.

### D. Reciprocal Compensation for Local Traffic

■ The PUC acted within its authority in reversing the arbitrator's decision and adopting "bill-and-keep" as an interim method for allocating the costs of transporting and terminating local traffic between U.S. West and TCG customers. The FCC has approved the use of this method and, though it may not have been the only permissible decision, the PUC reasonably could have concluded that it was appropriate to use that method here.

At the time it made its decision, the PUC had adopted bill-and-keep as the interim default method to be used until a permanent compensation method was agreed upon. *See* PUC Order 96–021, p. 52. That Order contains a detailed explanation of the reasons for the decision, discusses at length the diversity of opinions regarding the best way to provide reciprocal compensation, and outlines the efforts the PUC would make to obtain additional data and devise a long-term solution.

■ Order 96–021 emphasized that bill-and-keep was to be used "for an interim period of not more than 24 months."*Id.* Subsequently, the PUC confirmed its decision to let all existing bill-and-keep arrangements lapse effective January 12, 1998, but chose to let the parties to each interconnection agreement negotiate their own permanent ar-

rangements instead of the PUC establishing a single method. *See* PUC Order 97–372.

US West contends that the bill-and-keep provisions in its Agreement with TCG have therefore lapsed or been abrogated. TCG responds that under the terms of the Agreement, bill-and-keep remains in place until the PUC establishes an alternative form of compensation (or certain other events occur).

Under TCG's interpretation of the Agreement and of the PUC Orders, TCG has no incentive to ever negotiate a replacement method of compensation with U.S. West. That is unacceptable. In its Order 97–372 (September 18, 1997), the PUC specifically directed the parties to "commence negotiations immediately to develop a permanent reciprocal compensation mechanism." *Id.* at 2. The PUC Order also directed the parties to "notify the Commission regarding the progress of negotiations. If the parties cannot agree on a compensation method, the matter may have to be resolved pursuant to the dispute resolution provisions in the contracts."

On November 5, 1997, U.S. West formally invited TCG to commence negotiations on a replacement compensation arrangement. On January 5, 1998, TCG declined the offer, insisting that the existing arrangement remains in effect until it is superseded by a new compensation arrangement established by the PUC.

TCG is wrong. The contractual provision (Section IX(A)(1)(a)) that TCG cites is premised upon the assumption that the PUC would continue to prescribe the compensation methodology. However, the PUC has now abandoned that role and is allowing the parties to independently negotiate an agreement. Section XIX of the Agreement specifies that if a subsequent action by the PUC or FCC "renders the Agreement inoperable or creates any ambiguity or requirement for further amendment to the Agreement, the Parties will negotiate in good faith to agree upon any necessary amendments to this Agreement." The record before this court suggests that TCG has not done so.

The terms of Section IX(A)(1)(a) also undermine TCG's contention that the bill-and-keep arrangement in the U.S. West–TCG Agreement exists entirely independent of the PUC Orders governing this topic. In addition, the final sentence of Order 97–372, which states that the PUC may extend bill-and-keep for a short period if the parties have been unable to resolve the compensation issue, lends further support to U.S. West's contention that the PUC did not intend for bill-and-keep to remain in place indefinitely until TCG decides that it is willing to negotiate.

Under the terms of their Agreement, and of the PUC's Order, the parties must make a good faith attempt to resolve the compensation issue through negotiations. If they are unable to resolve the matter, then the dispute resolution provisions in the contract should be invoked.[3]

### E. Combining Local and Toll Traffic

US West complains that the Agreement lets TCG combine toll and local traffic on two-way trunks, when the industry practice is to separate local and toll traffic because it is difficult to reliably distinguish between the two for billing purposes if they are commingled. This is precisely the sort of technical question that should be addressed in the first instance by the PUC. In reviewing the arbitrator's decision and that of the PUC, it does not appear that either directly addressed the issue, which strongly suggests that U.S. West did not adequately call the issue to their attention and insist upon its resolution. The court declines to address this issue here for the first time. However, U.S. West is not precluded from requesting resolution of this issue when the contract comes up for renegotiation.

### F. Conduit Pricing

The arbitrator did not abuse his discretion by setting a flat annual rate (.60 per foot) for use of U.S. West conduits, rather than negotiating a separate price for each conduit.

---

**3.** The court expresses no opinion as to which permanent compensation method should be adopted, nor does it preclude consideration of bill-and-keep as a permanent replacement method.

### 2. *Count II (recombining elements)*

■ US West seeks to clarify the Agreement to make clear that U.S. West has no obligation to recombine unbundled elements for TCG. U.S. West's principal concern is that, if forced to recombine these elements, it would be providing a finished service at a price far below even the discounted wholesale price for finished services. This would be contrary to the dichotomy (between resale and unbundled elements) that Congress established in 47 U.S.C. § 251(c)(3) and (c)(4), and create a substantial incentive for arbitrage. *See Iowa Utilities*, 120 F.3d at 813. From U.S. West's perspective, by analogy, TCG can either order a complete car (and get a wholesale discount from the retail price) or else order the parts (at the unbundled rate) and assemble the product themselves, but TCG cannot insist that U.S. West recombine the parts so that TCG receives a finished car for the price of the unassembled parts. The arbitrator acknowledged this concern, but believed he had no authority to act:

> The FCC Rules appear to allow a carrier to purchase unbundled elements at unbundled element prices and have U.S. WEST bundle them back again to the finished service. The effect of the process is to allow a competitor to obtain a cheaper price than the Act's resale price (retail less cost avoided) for the same service. The competitor can thus completely circumvent the resale provisions of the Act by engaging in price arbitrage between resale prices and the prices of unbundled elements.... [However, t]he Act requires U.S. WEST to both unbundle and sell at wholesale discounts. The Act contains no provisions allowing restrictions on the use of unbundled elements.

Arbitrator's Decision (ARB 2), p. 13.

This issue is properly before the court. During the arbitration proceeding, U.S. West vigorously protested the practice of "sham unbundling" and asked that language be inserted in the agreement to prohibit such practice. *See, e.g.,* U.S. West's Supplemental Response in Light of FCC Interconnection Orders (R 10) at 4–5, 13–14. The arbitrator rejected U.S. West's request because he believed that he had no choice in light of the FCC's order. US West has properly sought review of that decision by this court.

TCG and the PUC contend that the court should not reach this issue because it is only a hypothetical controversy. The court disagrees. The court is reviewing the Agreement and the parties' respective objections to it. Whether this particular factual circumstance will actually arise in practice is not controlling. For that matter, there is no guarantee that the parties to this Agreement will ever purchase services from each other, hence the entire case may be for nought, but that possibility does not negate the existence of an actual controversy, at least in the context of this particular statute and the review process it establishes.

Because the arbitration decision predated the Eighth Circuit's decision in *Iowa Utilities*, this particular interconnection Agreement has never been reviewed to ensure compliance with the principles articulated by the Eighth Circuit. The PUC recently reconsidered its position on rebundling in light of *Iowa Utilities*, and issued PUC Order 98–467 (Nov. 13, 1998), which provides in relevant part that:

> MCImetro and GTE shall remove all provisions in [their] interconnection agreement that require GTE to combine network elements on behalf of MCImetro or which prohibit GTE from separating network elements that GTE currently combines. If the United States Supreme Court issues a decision in *Iowa Utilities Board* that is inconsistent with this conclusion, the parties may petition to revise the agreement.

*Id.,* p. 3. While that order is not binding in the instant case, the PUC likely would reach the same conclusion here.[4] Accordingly, the court remands this issue to the PUC for reconsideration and for such further proceedings as it deems appropriate.

---

4. In addition, there are a myriad of technical and pricing issues relating to recombining (or prohibitions upon separating) elements that implicate the PUC's expertise. The present agreement does not adequately address those issues.

### 3. Count III (performance standards and liquidated damages)

According to U.S. West, the Agreement improperly mandates that it meet performance standards exceeding even the standards under which it provides service to its own customers. However, U.S. West never explains whether it contends the Agreement contains more stringent standards than the actual levels of service it provides to its own customers or whether it is simply arguing that the standards in the Agreement are more stringent than the equivalent standards that the PUC has established for service by U.S. West to its customers. Nor has U.S. West provided this court with any basis upon which to make such a comparison.

The court concludes that TCG is entitled to the more favorable of the two measurements, *i.e.*, if the service that U.S. West actually provides to its own customers exceeds the minimum standards established by the PUC for service to U.S. West customers, then TCG should receive the benefit of that same high level of service. Otherwise, TCG would be receiving inferior service rather than service "that is at least equal in quality to that provided by the local exchange carrier to itself" as required by 47 U.S.C. § 251(c)(2)(C). Most of the disputed standards appear to be premised upon the average service that U.S. West actually provides to its ten largest customers, rather than some hypothetical standard. The PUC could reasonably require that U.S. West provide that same level of service to TCG.

The court also observes that the PUC has broad discretion to establish service standards in Oregon. Generally speaking, the Act does not preclude the PUC from heightening those standards when appropriate to spur service improvements by U.S. West, so long as the higher standards are generally applicable. Otherwise, the Act would have the perverse effect of locking in existing service levels and precluding service improvements, which would frustrate one of the principal reasons for encouraging competition among local exchange carriers.

In addition, the instant controversy does not arise in a vacuum. The court takes judicial notice of the ongoing disputes between the PUC and U.S. West regarding perceived inadequacies in U.S. West's local telephone service in Oregon. The PUC could reasonably have considered its past experiences with U.S. West in determining whether performance standards were required and the substance of those standards.

US West also objects to provisions in the Agreement that mandate an award of liquidated damages to TCG if U.S. West fails to meet certain performance standards. For the most part, these damages are available only if U.S. West repeatedly fails to meet the minimum standards, which are set below the target standards. Although the Act does not expressly provide for such damages, neither does it categorically preclude such provisions in an interconnection Agreement so long as they are reasonable and justified under the circumstances.

Inadequate service can be fatal to a new local exchange carrier such as TCG. If prospective customers try TCG service only to discover that they cannot reliably obtain a dial tone, that calls are disconnected in the middle of a conversation, or that service orders are not timely filled, then those customers will probably switch back to U.S. West and turn a deaf ear to future entreaties from TCG. Adverse publicity will also deter other prospective customers from considering TCG. Even assuming the problems are eventually resolved, that may not be soon enough to save TCG. Moreover, damages in such cases can be difficult to quantify and prove, and it would require years (and considerable expense) to litigate such claims. A further concern is that U.S. West stands to gain financially if customers become dissatisfied with TCG's local service, hence U.S. West is operating under a conflict of interest.

Under the totality of the circumstances, including the PUC's extensive experience in overseeing U.S. West service in Oregon, the PUC could reasonably conclude that enforceable performance standards, *i.e.*, those with teeth, are necessary and proper. Even if no damages are ever paid, the very existence of enforceable standards may help to reassure TCG (and other prospective CLECs) who might otherwise be hesitant to enter the local

telephone market, and to minimize the suspicions and accusations that might otherwise arise between TCG and U.S. West. The PUC also could reasonably have concluded that the liquidated damages clause would help to minimize costly litigation. US West disagrees with these premises, but the question before this court is not whether the PUC is correct but simply whether the PUC could reasonably have come to such a conclusion (it could), and whether the liquidated damages provision violates the Act (it does not).

US West also complains about many of the details of the performance standards and the liquidated damages. The arbitration was conducted "baseball-style." Each side's "last-best-offer" was presented to the arbitrator who was to choose between them. US West's last-best-offer offered little protection for TCG. The arbitrator therefore selected TCG's offer. While this would not preclude the court from setting aside the arbitrator's decision if it were truly inconsistent with the Act, under the circumstances the court declines U.S. West's invitation to re-argue the details of the standards and the provisions for damages.

There is no merit to U.S. West's contention that the liquidated damages clause is a penalty and is therefore invalid under Oregon law. The court also rejects U.S. West's argument that the Agreement violates state law because it allows TCG to recover both liquidated damages and also compensatory damages such as lost profits. The court interprets those contractual provisions as giving TCG the option of seeking either liquidated damages or conventional damages, but not both for the same incident. If liquidated damages were the exclusive remedy, then the clause would act as a cap on U.S. West's liability, regardless of the amount of damage that actually resulted from the breach. US West has not pointed to any Oregon authority that precludes the use of liquidated damages as an optional alternative to compensatory damages rather than a mandatory, exclusive remedy.

**4. Count IV (violation of delegated authority)**

Subparts A (resale of deregulated services) and B (application of resale discounts to non-

recurring charges) were previously dismissed. Subpart C (liquidated damages) essentially repeats Count III above. The PUC did not exceed its authority in approving the performance standards and remedies requested by TCG.

**5. Count V (interim number, portability)**

This claim is not discussed in U.S. West's briefs. Accordingly, the court deems it to have been withdrawn.

**6. Count VI (unrestricted collocation)**

This claim is not discussed in U.S. West's briefs. Accordingly, the court deems it to have been withdrawn.

**7. Count VII (due process)**

US West's due process claim primarily alleges that there was insufficient evidence in the record to support the challenged decisions. To the extent that this court has affirmed those decisions, the claim necessarily fails.

**8. Count VIII (taking)**

US West's taking claim does not seek compensation for a completed taking, but rather alleges that a taking will result if the PUC's decision is affirmed and U.S. West receives less compensation for services than the amount to which it allegedly is entitled. US West also urges this court to construe the Act so as to avoid a taking.

The court rejects defendants' contention that this claim must be dismissed because U.S. West has not exhausted state compensation remedies. It is doubtful that the state courts would have jurisdiction over such a claim, since the federal courts have exclusive jurisdiction over challenges to the interconnection agreements arising from the Act. 47 U.S.C. § 252(e)(4) and (e)(6). The takings claim is essentially the flip side of a challenge to the terms of the interconnection agreement (or a challenge to the Act itself).

Nevertheless, the taking claim fails because no taking has yet occurred. No evidence has been presented to this court to

show that TCG has purchased any services pursuant to this Agreement, nor is there any assurance it ever will. Even if TCG does purchase services, the details of those purchases are as yet undetermined. For instance, it is not clear whether TCG will purchase finished services or unbundled elements, or whether it will purchase services for residential or business use. In addition, a number of the prices and terms are clearly denominated as interim and subject to revision by the PUC once additional information is obtained.

Finally, since the Act mandates that U.S. West receive just and reasonable compensation, a determination by this court that the Agreement complies with the Act (or setting aside a provision that does not comply with the Act) is fatal to any claim that U.S. West's property has been taken without just compensation.

### ORDER

The cross-motions for summary judgment by U.S. West (docket # 65–1), the PUC and the Commissioners (docket # 76–1), and TCG (docket # 79–1) are each GRANTED IN PART AND DENIED IN PART. Summary judgment is GRANTED FOR DEFENDANTS on part of Count I (interim loop price, collocation rates, resale discount excepting those services already subject to a volume or term discount, combining local and toll traffic, and conduit pricing), Count III (performance standards and liquidated damages), Count IV (violation of delegated authority), Count V (interim number portability), Count VI (unrestricted collocation), Count VII (due process), and Count VIII (taking).

Summary judgment is GRANTED FOR PLAINTIFFS on the portion of count I that concerns resale discounts for services already subject to a volume or term discount. The PUC shall revise Section X of the TCG Agreement to provide that the wholesale discount for services already subject to volume or term discounts shall be the greater of (1) the wholesale discount rate (which is presently 17 percent), or (2) one-half of the wholesale discount rate plus any existing volume or term discount.

That portion of Count I concerning the "final" (or UM 844) loop price, and Count II (combining unbundled elements), are REMANDED to the PUC for reconsideration and further proceedings as it deems appropriate.

The court AFFIRMS the interim use of bill-and-keep for allocating the costs of transporting and terminating local traffic between U.S. West and TCG customers, but TCG and U.S. West must promptly negotiate a replacement methodology in accordance with PUC Order 97–372 and Section XIX of their Agreement.

IT IS SO ORDERED.