# United States Court of Appeals
## For the First Circuit

No. 06-1563, No. 06-1564

WORLDNET TELECOMMUNICATIONS, INC.,

Plaintiff, Appellee,

v.

PUERTO RICO TELEPHONE COMPANY; TELECOMMUNICATIONS
REGULATORY BOARD OF PUERTO RICO; MIGUEL REYES-DÁVILA,
in his official capacity as member; VICENTE AGUIRRE-ITURRINO,
in his official capacity as member; NIXYVETTE SANTINI-HERNÁNDEZ,
in her official capacity as member,

Defendants, Appellants.

_____

No. 06-1565, No. 06-1566

PUERTO RICO TELEPHONE COMPANY,

Plaintiff, Appellant/Cross-Appellee,

v.

TELECOMMUNICATIONS REGULATORY BOARD OF PUERTO RICO;
MIGUEL REYES-DÁVILA, in his official capacity as member;
VICENTE AGUIRRE ITURRINO, in his official capacity as member;
NIXYVETTE SANTINI-HERNÁNDEZ, in her official capacity as member,

Defendants, Appellees/Cross-Appellants.

_____

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté,  U.S. District Judge]

_____

Before

Boudin, <u>Chief Judge</u>,

Lipez, <u>Circuit Judge</u>,

and Shadur,* <u>Senior District Judge</u>.

_____

Joshua S. Turner with whom John E. Barry, John W. Kuzin, Wiley Rein & Fielding LLP, Ricardo L. Ortiz-Colón, Luis A. Oliver and Fiddler, González & Rodríguez, P.S.C. were on brief for Puerto Rico Telephone Company.
Robert F. Reklaitis with whom Leslie Paul Machado was on consolidated brief for Telecommunications Regulatory Board of Puerto Rico and Its Individual Members on liquidated damages issue.
Robert F. Reklaitis with whom Leslie Paul Machado was on consolidated brief for Telecommunications Regulatory Board of Puerto Rico and Its Individual Members on performance standards issue.
R. Bruce Beckner with whom Fleischman and Walsh, L.L.P., Frank A. Rullán and GrayRobinson, P.A. were on consolidated brief for WorldNet Communications, Inc.

_____

May 11, 2007

_____

_____

*Of the Northern District of Illinois, sitting by designation.

**BOUDIN, <u>Chief Judge</u>**. Seeking to spur competition in the telecommunications industry, Congress a decade ago passed the Telecommunications Act of 1996 ("the Act").[1] The Act not only permitted competitors to operate their own local exchange networks in competition with the local telephone company, 47 U.S.C. § 253(a), (d) (2000), but also obliged the local incumbent to assist new entrants in several respects, <u>id</u>. § 251(b)-(c). Pertinently, section 251 places on incumbent carriers a duty to provide competitors the ability to

> interconnect[] with the [incumbent] carrier's network-- (A) for the transmission and routing of telephone exchange service and exchange access; (B) at any technically feasible point within the carrier's network; (C) that is at least equal in quality to that provided by the local exchange carrier to itself or to any subsidiary, affiliate, or any other party to which the carrier provides interconnection; and (D) on rates, terms, and conditions that are just, reasonable, and nondiscriminatory . . . .

47 U.S.C. § 251(c)(2).

Interconnection allows customers of the competitor to "place calls to, and to receive calls from, customers on the incumbent's network." Huber et al., <u>Federal Telecommunications Law</u> 54 (2d ed. 1999). Incumbent carriers must negotiate

---

[1]The Act, Pub. L. No. 104-104, 110 Stat. 56 (1996) (codified in various portions of 47 U.S.C.), amends Title II of the Communications Act of 1934, under which interstate common carrier telephone service had long been regulated; intrastate service regulation had been left to state commissions.

interconnection terms with competitors in good faith (e.g., facilities, timing), 47 U.S.C. § 251(c)(1), and if negotiations fail, either party "may petition a State commission to arbitrate any open issues." Id. § 252(b)(1).

WorldNet Telecommunications, Inc. ("WorldNet"), sought to enter the Puerto Rico market in competition with the local incumbent, the Puerto Rico Telephone Company ("PRT"). The local regulatory authority in Puerto Rico is the Telecommunications Regulatory Board of Puerto Rico ("the Board"). In 2003, after the requisite period of negotiation, WorldNet petitioned the Board for arbitration to resolve 355 issues relating to an interconnection agreement it sought with PRT.

These issues included the performance standards to which PRT would be held--for example, the time within which PRT must enter WorldNet service orders or make line repairs for it--and a liquidated damages schedule requested by WorldNet to back up the standards. The Board appointed an arbitrator, who held a three-day hearing and issued an order adopting (among other things) WorldNet's proposed performance standards as well as its proposed liquidated damages schedule for non-performance.

The parties amended their interconnection agreement to match the arbitrator's order and, as required by the statute, 47 U.S.C. § 252(e)(1), submitted the agreement to the Board for approval. Before the Board, PRT challenged the terms imposed by

-4-

the arbitrator, including the performance standards and the liquidated damages amounts. The Board ultimately upheld the standards but modified the arbitrator's order to allow PRT to ramp-up its performance more slowly over the duration of the three-year agreement: after an implementation period of six months during which the performance standards would not be in effect, PRT would have to maintain compliance for successive 10 month periods at an 85 percent level, then 90 percent and then 95 percent.[2]

As for liquidated damages, the Board said that the amounts endorsed by the arbitrator were unreasonable because they were intended to punish PRT, not to compensate WorldNet for actual damages. Finding that the record lacked evidence as to WorldNet's predicted actual damages from PRT's failure to comply with the various performance standards, the Board set aside the liquidated damages remedy in its entirety. It concluded that other means, such as the Board's power to fine PRT for breaches, provided PRT with a sufficient incentive to perform.

PRT and WorldNet each sought federal district court review, 47 U.S.C. § 252(e)(6): PRT alleged that the Board's performance standards impermissibly required PRT to provide WorldNet with better service than it provided to its own customers;

---

[2]The arbitrator had not provided for an implementation period, and had required 85 percent compliance for the first nine months, 95 percent compliance for the next nine months, and 100 percent compliance for the remaining eighteen months of a three-year agreement.

and WorldNet challenged the Board's rejection of its liquidated damages proposal. The district court (adopting the magistrate judge's recommendation) affirmed the Board as to the performance standards, but remanded the liquidated damages issue for further consideration by the Board.

PRT now seeks review of the Board's performance standards ruling, and PRT and the Board both seek review on the liquidated damages issue. In light of the district court's remand to the Board for further proceedings, we face at the outset the question whether the district court's action constitutes a "final decision"--a jurisdictional requirement for us, 28 U.S.C. § 1291 (2000), subject to various exceptions.

"Finality" is not a self-defining label but a bundle of rules and policies, framed by judges, to implement a concept.[3] The problem is especially complicated where the district court is itself reviewing an agency. If the district court had affirmed the Board outright, the judgment would clearly be final; it would also be final if the court had remanded with directions to reach a specified result, since deferring review would serve no practical purpose. Catlin v. United States, 324 U.S. 229, 233 (1945).

---

[3]E.g., Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546-47 (1949) (giving finality a "practical rather than a technical construction"); Rhode Island v. EPA, 378 F.3d 19, 24-25 (1st Cir. 2004).

By contrast, where a remand by the district court leaves the agency with latitude for action, a court of appeals will ordinarily defer review of the remand order since the ultimate outcome is uncertain. Global Naps, Inc. v. Mass. Dep't of Telecomm. & Energy, 427 F.3d 34, 41 (1st Cir. 2005). But our decisions have made prudential exceptions--pertinently, where deferral would compromise the agency's ability to ever get effective review of a district court remand order with which it disagrees.[4]

This is not a risk if the district court tells the agency to better explain its position or address a missed issue. But if the remand requires the agency to take action under a legal standard with which it disagrees, the agency may be compelled to enter a new order and--on further judicial review--may be forced to defend its new order as a proper application of a mandate that the agency opposes and that it has never had an opportunity to challenge on appeal. Global Naps, 427 F.3d at 42-43.

In this case, the district court altered the legal template by telling the Board that it could not reject liquidated damages solely on the basis that they exceeded WorldNet's actual damages. This in turn sets the stage for the likely adoption of

_____

[4]Global Naps, 427 F.3d at 41-42; Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 151 (1st Cir. 1989); Mall Props., Inc. v. Marsh, 841 F.2d 440, 443 (1st Cir.) (per curiam), cert. denied sub nom, 488 U.S. 848 (1988).

liquidated damages exceeding WorldNet's costs--which is just what the agency opposes.  Immediate review is justified in this case not merely for the sake of efficiency but because the Board could otherwise be compromised on a later appeal because its own decision would rest on a position that it opposes.

Turning to the merits, we start with the district court's remand on the liquidated damages issue.  Where as here judicial review is based on the agency record, we apply to the agency ordinary review standards, accepting the district court decision merely as it may be persuasive.  Assoc. Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997).

The ordinary standards for reviewing agency decisions are deferential (in varying degrees) as to matters of fact, policy and application of general standards, but de novo as to questions of law, Global Naps, Inc. v. Verizon New England, Inc., 396 F.3d 16, 23 n.8 (1st Cir.), cert. denied, 544 U.S. 1061 (2005), save that an agency also receives deference in interpreting its own statute. Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 843-44 (1984). Where a statute prescribes a different review standard, it governs.

Here, a further wrinkle exists because the Board is itself engaged in reviewing an arbitrator's decision and, under the Act, may reject an arbitrated agreement (or part of an agreement) only if the agreement prescribed by the arbitrator (1) does not

-8-

hold the carriers to their obligations under section 251 (primarily interconnection obligations) or (2) fails to meet the pricing standards of section 252(d), see 47 U.S.C. § 252(e)(2)(B)--with the further qualification that

> nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of an agreement, including requiring compliance with intrastate telecommunications service quality standards or requirements.

Id. § 252(e)(3).

The arbitrator's decision is thus the starting point for the Board, and we agree with the district court that the Board has not adequately justified its rejection of liquidated damages. But our reasoning differs substantially from that of the magistrate judge's recommendation adopted by the district court. The difference in reasoning directly affects the Board's latitude on remand.

The Board acknowledged that liquidated damages comprising actual damages would encourage PRT to comply with performance standards. But the liquidated damages schedule proposed by WorldNet--figures adopted wholesale by the arbitrator--were (WorldNet itself conceded) not limited to likely actual damages. The Board therefore deemed the schedule adopted in the agreement to be unreasonable and punitive.

Since WorldNet could not identify the portion that comprised actual damages rather than what WorldNet deemed an

-9-

"incentive" element, the Board said it had before it no evidence that would enable it to calculate actual damages. Finally, the Board pointed to other means to assure PRT's compliance: Board fines up to $25,000 per violation, its contempt power, and court proceedings by WorldNet to secure equitable and damages relief for violations of the agreement.

If we were reviewing an ordinary decision by an agency charged with overseeing interconnection, this might well be an adequate explanation for declining to adopt a liquidated damages provision as an enforcement tool. Nothing in the Act mandates liquidated damages. The burden was on WorldNet to supply evidence for a provision it sought. A regulatory agency ordinarily has considerable latitude in deciding how to regulate.

Under the Act, however, the Board's review of an arbitrated agreement is constrained by section 252(e)(2) (quoted above). This provision allows the state agency to override an arbitrator's decision on two explicit grounds, neither of which is applicable here. But the statute goes on in a further provision to reserve state authority on such review to impose "other requirements of State law" so long as not inconsistent with section 253. Id. § 252(e)(3).

The Board seemingly assumed that liquidated damages exceeding a reasonable estimate of damages to WorldNet were forbidden either by Puerto Rico law or by something inherent in the

-10-

concept of liquidated damages. This is suggested, although not established, by the Board's own cryptic description of the arbitrator's figures as designed to "punish"--which is a common short-hand, along with "penalty," for liquidated damages in excess of actual damages. See, e.g., Space Master Int'l, Inc. v. City of Worcester, 940 F.2d 16, 18 (1st Cir. 1991).

It is further suggested, more explicitly, by the Board's brief in this court. On the liquidated damages issue, it devotes itself to case law from various jurisdictions showing that courts regularly strike down liquidated damages provisions in commercial contracts where the amounts are intended to exceed actual damages. Courts have historically been opposed to penalty clauses in private contracts and many still take this view.[5]

Yet the interconnection agreements are not ordinary commercial contracts: the Act dictates their creation; they are imposed by involuntary arbitration and agency review if the parties cannot agree; and their aim is to secure the public benefit of competition. Incentive payments not limited to actual damages (e.g., civil penalties and criminal fines) are familiar devices to achieve public ends. So courts, as a matter of federal law, have

---

[5]See, e.g., Priebe & Sons, Inc. v. United States, 332 U.S. 407, 411 (1947) (applying general principles of contract law to a government contract); Checkers Eight Ltd. P'ship v. Hawkins, 241 F.3d 558, 562 (7th Cir. 2001) (Illinois law); Space Master, 940 F.2d at 18 (Massachusetts law); Leasing Serv. Corp. v. Justice, 673 F.2d 70, 73 (2d Cir. 1982) (New York law).

allowed states to approve interconnection agreements imposing liquidated damages that include incentive elements exceeding actual compensation.[6]

While the law of some states may forbid such damages provisions even in interconnection agreements, Puerto Rico courts have been more solicitous of liquidated damages clauses than their Anglo-American counterparts, seeming even in private contracts to permit coercive and punitive clauses so long as they are not excessively so. E.g., Rochester Capital Leasing Corp. v. Williams Int'l Ltd., 103 D.P.R. 163, 1974 PR Suo. LEXIS 452, at *9 (P.R. 1974); Rodriguez Lopez v. Jimenez Aponte, 1997 PR App. LEXIS 271, at *10-*13 (P.R. Cir.). If the Board thought that some legal rule precluded it from adopting liquidated damages in excess of actual costs, this was a mistake.

However, local agencies make policy on their own and section 252(e)(3) reserves the Board's authority to "establish[] . . . requirements of State law in its review of an agreement" (emphasis added). And the Act, although imposing certain federal requirements, is intended to defer to state agencies on matters that do not compromise the achievement of federal aims.

---

[6]Sw. Bell Tel., L.P. v. Pub. Util. Comm'n of Texas, 467 F.3d 418, 421, 425 (5th Cir. 2006); MCI Telecomms. Corp. v. Mich. Bell Tel. Co., 79 F. Supp. 2d 768, 776 (E.D. Mich. 1999), aff'd 37 Fed. Appx. 767 (6th Cir. 2002); US West Comms., Inc. v. Hix, 57 F. Supp. 2d 1112, 1121-22 (D. Colo. 1999); US West Comms., Inc. v. TCG Or., 31 F. Supp. 2d 828, 837 (D. Or. 1998).

§ 252(e)(3); <u>City of Abilene, Tex.</u> v. <u>FCC</u>, 164 F.3d 49, 53 (D.C. Cir. 1999); <u>Aegerter</u> v. <u>City of Delafield, Wis.</u>, 174 F.3d 886, 887-88 (7th Cir. 1999).

In reconciling the limitation on the Board's authority in section 252(e)(2) with the preservation of its authority in section 252(e)(3), we treat an arbitrated agreement governed by section 252(b) as a <u>presumptive</u> solution: it must be accepted if consistent with sections 251 and 252(d), <u>unless</u> the local agency reasonably finds that the arbitrator's solution conflicts with state statutes, agency rules, or considered policy determinations that the agency would follow in matters wholly within its jurisdiction.

This is a workable solution to the inherent conflict, not crisply addressed in the Act, between the arbitrator's authority and that of the appointing Board.  The Board has to remain free to adopt and implement general policies; otherwise, among other problems, different arbitrators could inflict inconsistent interconnection agreements on different new competitors.  At the same time, the agency policies that override the arbitrator's choice ought be ones that the Board would follow in other situations and not just ad hoc preferences.

In this case, it is not enough that the Board, if framing the agreement itself, would eschew incentive payments exceeding projected actual damages.  Rather, the Board must reasonably conclude that such incentive payments are inconsistent with

-13-

regulatory policy that it would adhere to in comparable "local" cases where the Act plays no role. It may take this position on remand despite our own holding that neither federal nor Puerto Rico law automatically forbids such "penalties" in this context. Indeed, in a regulatory context, terms like "penalty" or "punitive" are not usually decisive.

Rather, for regulators, creating special incentives for compliance is often a permissible option. See note 6, above. And, from a prudential standpoint, the more typical questions are whether an extra incentive element in damages is necessary in light of other tools for securing compliance and whether it may have negative effects of its own, especially where the substantive standards are untested or ambitious. In all events, these are the kinds of considerations that expert agencies can weigh better than courts in relation to the conditions before them.

Also, although WorldNet did not supply information allowing the Board to calculate cost-based liquidated damages, this information could likely be determined by further hearings at the Board or arbitrator level. And, of course, liquidated damages can be reasonable approximations; one reason for using them is the difficulty of making exact calculations. Vazquez v. Eastern Air Lines, Inc., 579 F.2d 107, 110 n.3 (1st Cir. 1978). This does not mean that the Board has to pursue such an option; the Act does not say what should be done if an arbitrator's award is found

inadequate in part, and the Board arguably retains a good deal of latitude in such cases.

On remand, the Board must recognize that neither the Act nor Puerto Rico precedent forbids incentive-based liquidated damages; that the arbitrator's solution cannot be set aside unless it violates general agency policy; and that the Board should not assume an inability to use cost-based liquidated damages. If the Board takes the position that liquidated damages may not exceed actual damages, whether to consider further the possibility of designing such liquidated damages is a matter for it to decide.

This brings us to the second large issue raised on appeal, namely whether the Board has authority to impose performance standards that require PRT to provide service to WorldNet superior to the service it currently provides itself. The question turns on issues of both federal and Puerto Rico law. We begin by tracing briefly how the question arose and how the issues were addressed by the arbitrator, by the Board and finally by the district court.

In adopting performance standards largely as proposed by WorldNet, the arbitrator recognized PRT's claim that it was only obliged to provide equal treatment to WorldNet and said that PRT could present evidence to the Board showing that individual standards exceeded the service PRT provided to itself. The Board decided that it was empowered to adopt performance standards

requiring PRT to provide WorldNet with service superior to the service PRT currently provided to its own customers, and the district court agreed.

In this court, PRT renews its claim that the Board has no power to adopt performance standards requiring superior service, arguing that nothing in the Act warrants such standards for competitors and that under federal law PRT cannot be forced to discriminate against its own customers. And, according to PRT, the Board has no independent power under local law to require PRT to provide superior service to WorldNet.

Starting with federal law, we agree with PRT that the Act does not explicitly provide for the local carrier to offer superior service to competitors, but neither does it forbid such an outcome. Section 251(c)(2) provides that the incumbent carrier--here, PRT-- is under an obligation to provide the competitor with transmission and routing services "at least equal in quality to that provided by the local exchange carrier to itself" (emphasis added).

In a decision cited to us by PRT, the Eighth Circuit held that the FCC could not rely upon the quoted language to create a right to superior service under federal law. Iowa Utils. Bd. v. F.C.C., 120 F.3d 753, 812-813 (8th Cir. 1997), rev'd in part on other grounds sub nom, 525 U.S. 366 (1999). But that decision is inapposite: in setting superior performance requirements for

service to WorldNet, the Board in this case relied upon its own authority under local law.

The authority of the Board to adopt under local law additional interconnection requirements not mandated by the Act is explicitly set forth.  See section 252(e)(3) (quoted above).[7]  As the Seventh Circuit held, the Act sets a federally mandated floor of equal service, and State commissions retain authority to "raise the bar."  Ind. Bell Tel. Co. v. AT & T, 362 F.3d 378, 391-93 (7th Cir. 2004).  As performance standards affect local service as well as interstate service, this is hardly surprising.

This assumes, of course, that local law provides the agency with power to raise the bar--an issue to which we will return.  Before doing so, we address a different claim by PRT that other provisions of federal law bar the Board from ordering the incumbent to provide better service to a competitor than it provides to itself.  Specifically, PRT relies upon section 253(a), which states:

> No State . . . statute or regulation, or other . . . requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

---

[7]See also § 261(c) ("Nothing in this part precludes a State from imposing requirements on a telecommunications carrier for intrastate services that are necessary to further competition in the provision of telephone exchange service or exchange access, as long as the State's requirements are not inconsistent with this part or the Commission's regulations to implement this part.").

PRT says that the performance standards imposed by the Board are unattainable and are therefore within the ban of section 253(a). Of course, if the standards were really _unattainable_, they could hardly be what Congress had in mind in framing the Act. PRT _says_ that the standards prescribed are unattainable, but its examples are limited and our review of its evidence does not bear out its claims. The technical detail is in an addendum to this decision.

Where an agency requires service superior to existing standards, uncertainty may very well exist as to whether it can be achieved; but the carrier is in the best position to prove the limits of its own capability and PRT has not done so here. The Board has adopted a phase-in approach and refused thus far to adopt automatic liquidated damages. If experience shows that the standards cannot be achieved, PRT can ask the Board to modify them.

PRT's next argument that the superior service requirements are inconsistent with the Act is grounded in section 251(c)(2)(D), which places a duty on incumbent carriers to provide interconnection services "on rates, terms, and conditions that are . . . nondiscriminatory," and section 202(a), which makes it "unlawful for any common carrier to make any unjust or unreasonable discrimination in . . . services."

Nothing prevents PRT from doing for its own customers anything that it does for WorldNet under the new standards. If PRT

-18-

chooses not to give its own customers equal service, possibly it will be liable for discriminating against them. But it has little incentive to provide worse service to itself than it provides to competitors and, if it does, it can hardly use this as a defense against offering proper service to others.

PRT also argues that superior service requirements are not "competitively neutral," in violation of section 253(b).[8] Assuming without deciding that this subsection provides an independent limitation on state and local government action, compare TCG Detroit v. City of Dearborn, 206 F.3d 618, 624 (6th Cir. 2000), with BellSouth Telecomms., Inc. v. Town of Palm Beach, 252 F.3d 1169, 1187-91 (11th Cir. 2001), the superior service requirements do not violate the statute: PRT remains free to offer its own customers the same level of service it offers WorldNet, and so can remain competitive.

This brings us to the question whether the Board was authorized by state law to require improved service standards. We must begin by determining whether we have authority to consider this question, an issue discussed by neither of the parties. The federal courts are empowered to review a state commission's

---

[8]Section 253(b) reads: "Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis . . . , requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers."

approval or rejection of an interconnection agreement under section 252(e)(6), which provides:

> In any case in which a State commission makes a determination . . . any party aggrieved . . . may bring an action in . . . Federal district court to determine whether the agreement . . . meets the requirements of section 251 of this title and this section.

In Puerto Rico Telephone Co. v. Telecommunications Regulatory Board of Puerto Rico, 189 F.3d 1 (1st Cir. 1999), this court declined to review a decision of the Board on the ground that it was not within this grant of review authority. The Board had held that PRT violated Puerto Rico law when it failed to give notice before imposing long-distance charges on its own customers for calls made to customers of a competitor with which PRT had an interconnection agreement.

Although the parties there had an interconnection agreement, it had previously been approved. The relief granted by the Board did not constitute enforcement of the agreement and rested solely upon Puerto Rico law. This court held that the Board's decision as to the charges had "an insufficient nexus" to the interconnection agreement and was not the kind of "determination" properly reviewed in a federal court under section 252(e)(6) of the Act. P.R. Tel. Co., 189 F.3d at 11-13.

In our own case, the Board's reading of Puerto Rico law directly controls its approval of the interconnection agreement, so

the nexus could not be closer.  The agreement itself incorporates enhanced performance standards which are not mandated by the federal statute, which the Board has adopted on its own authority, and which PRT claims to be invalid under Puerto Rico law.  The validity of the agreement as to the standards thus depends on local law.

Puerto Rico Telephone Co. also rests on the alternative ground that federal courts have limited authority to review determinations of state law made by state commissions.  189 F.3d at 13-14.[9]  But our decision explicitly left room for federal court review in situations where the state law issue is essential for deciding whether to approve or reject an interconnection agreement. Id. at 15.  Otherwise, the statute--which bars state courts from reviewing a state commission's action in approving or rejecting such an agreement, § 252(e)(4)--would leave a serious gap in the availability of judicial review.

Although the Board's authority under local law is a legal issue, it is customary where any doubt exists to give some deference to the agency charged with administering the statute.

---

[9]Accord Ill. Bell Tel. Co. v. Worldcom Techs., Inc., 179 F.3d 566, 571 (7th Cir. 1999), cert. denied, 535 U.S. 1107 (2002).  But see Mich. Bell Tel. Co. v. MCIMetro Access Transmission Svcs., Inc., 323 F.3d 348, 356-57 (6th Cir. 2003); Sw. Bell Tel. Co. v. Pub. Util. Comm'n of Tex., 208 F.3d 475, 482 (5th Cir. 2000); Sw. Bell Tel. Co. v. Brooks Fiber Comms. of Okla., Inc., 235 F.3d 493, 498 (10th Cir. 2000); US West Comms. v. MFS Intelenet, Inc., 193 F.3d 1112, 1117 (9th Cir. 1999), cert. denied, 530 U.S. 1284 (2000).

Cf. Chevron, 467 U.S. at 843. The Telecommunications Act of Puerto Rico, P.R. Laws Ann. tit. 27, § 265 (2004) et seq. ("Law 213") gives the Board general authority to make regulations, id. § 267f(a); says that it should be guided by the public interest and "especially" to protect consumers, id. § 267f(f); and says that the statute should be "liberally construed in order to achieve its purposes," id. § 267i.

Although there is no express Puerto Rico statutory provision addressed to the setting of performance standards, neither is there any provision that prohibits them. The statute states that

> whenever any specific power or authority is granted to the Board such specification shall not be construed as excluding or impeding any other power or authority otherwise conferred on it. The Board created herein shall have, in addition to the powers specified in this chapter, all those additional implicit or incidental powers that are pertinent and necessary to put into effect and carry out, perform and exercise all the above-mentioned powers and to attain the purposes of this chapter . . . .

Id. Setting performance or quality standards is routinely done in utility regulation, and it would be peculiar if Law 213 had withheld this authority from the Board.

PRT cites Caribe Communications v. Puerto Rico Telephone Co., 2002 PR Sup. LEXIS 81 (P.R. 2002), holding that the Board did not have authority to award compensatory damages in an adjudication, but the power to award damages--unlike standard

-22-

setting--is historically associated with judicial authority. We do not read <u>Caribe</u> to establish any general rule that the Board's powers are to be narrowly construed. See <u>P.R. Tel. Co.</u> v. <u>Regulatory Telecomms. Bd.</u>, 151 D.P.R. 269, 290 (2000).

PRT also points to section 269c(c), which states that interconnection agreements must be made "in accordance with terms <u>not less favorable</u> than those provided to the affiliates of the local exchange service carrier." P.R. Laws Ann. tit. 27, § 269c(c) (emphasis added). But the statute does not by its terms preclude setting standards that exceed current service and requiring them to be available to competitors. "Not less favorable" implies that more favorable is an option.

There is, as PRT points out, counterpart language in section 251(c)(2) of the Act ("at least equal in quality"); and (as discussed above) one circuit court has construed this to prohibit the FCC from requiring superior service for interconnection competitors. <u>Iowa Utils. Bd.</u>, 120 F.3d at 812-813. But the contexts are different: the FCC was given a limited mandate as to interconnection, but the Board is endowed with general regulatory powers and is entitled to read its grant of authority broadly.[10]

---

[10]<u>Iowa Utils. Bd.</u> is explained in part by the FCC's regulation at issue, which required that incumbent carriers provide superior service so long as technically feasible "if so requested" by another carrier, 47 C.F.R. § 51.305 (a)(4) (1997); as the Eighth Circuit explained, this regulation forced incumbent carriers to "cater to every desire of every requesting carrier." <u>Iowa Utils. Bd.</u>, 120 F.3d at 813.

Thus, we conclude that the Board is permitted to adopt the superior service standards. On this issue, we affirm the Board, while on the liquidated damages issue we remand. The two issues could be deemed interrelated; unproved high performance standards obviously weigh against generous liquidated damages. So nothing in our affirmance prevents the Board from revisiting the standards if it determines that liquidated damages should be adopted.

WorldNet's motion to dismiss the appeals for lack of subject matter jurisdiction is <u>denied</u>, and the case is <u>remanded</u> to the district court with directions to remand to the Board for further action not inconsistent with this decision. Each party shall bear its own costs.

<u>It is so ordered.</u>

ADDENDUM

In its opening brief, PRT asserts generally that "among the dozens of superior service requirements imposed by the Board are requirements that are indisputably unattainable." It cites to Appendix B of its Motion on Reconsideration, but this Appendix simply lists the performance standards that PRT alleges would require it to provide better service to WorldNet than it currently provides to itself. The mere fact that the standards require superior service does not necessarily mean that they are unattainable; and the Board and the arbitrator both credited testimony by two WorldNet witnesses that the standards were achievable by PRT.

Nor does PRT ever explain why the Board's ramp-up solution is insufficient to enable its performance. PRT argued before the Board that requiring 100 percent compliance, even in the last third of the contract term as required by the arbitrator, was unreasonable, and it proposed a 90 percent compliance rate. The Board responded by lowering the maximum compliance level to 95 percent and creating a six-month implementation phase during which the performance standards were suspended. In its briefs on appeal, PRT never explains why, even with this adjustment, the performance standards are still unattainable.

In addition to its general averment that the standards cannot be achieved, PRT also specifically lists five performance standards as unattainable. But the Board found to the contrary, and PRT does not explain why it erred in doing so.

First, performance standard #27 requires that PRT notify WorldNet within three business days if it is unable to complete a WorldNet order because the necessary facilities are unavailable. PRT argues--supported by an affidavit from one of its employees--that such notice cannot feasibly be provided because "a technician must be dispatched to examine the area to determine if cables are available and . . . in working condition."

The Board responded: "To the extent PRTC retail has access to this information, it should be provided to WorldNet. The performance standard is affirmed." We understand the Board to have modified the performance standard so that PRT is obligated to provide WorldNet within three days only with the information to which it has access. On appeal, PRT never explains why, as modified, this performance standard is unattainable.

Second, performance standard #54 requires PRT to provision special service loops within 15 business days. PRT asserts that this time-frame is unreasonable; in 2004, it took PRT an average of 44.62 business days to provide special service DS-3 loops to its wholesale customers and 48.6 business days to its retail customers. The Board did not credit PRT's assertion,

-26-

finding that "[t]he ramp-up period provides PRTC with sufficient time to improve its performance." On appeal, PRT nowhere explains why the ramp-up period is insufficient.

Finally, performance standard #45 requires PRT to clear a POTS trouble report within two business days; standard #46 requires PRT to clear a special service trouble report within one business day; and standard #53 requires PRT to provision POTS loops within ten business days. PRT never alleged that these time-frames are unattainable; it noted only that the standards would require much faster service than it currently provides to its own retail customers. The Board found with respect to each standard that the ramp-up period would give PRT sufficient time to improve its performance, and on appeal PRT never explains why the Board is mistaken.